Peelle, J.,
dissenting:
I dissent from the conclusion of the majority of the court in this case, because, in my judgment, the master of the Future City, with her tow of eight barges, each 225 feet in length, 10 feet hold, and 36 feet beam, loaded to their full capacity, did not exercise ordinary care and caution on entering the harbor of New Orleans or in the handling of her tow after she entered; and that, therefore, even if the vessels of the defendants were anchored at an improper place in the harbor, the negligence of the Future City contributed to the collision and the consequent loss of her barges, and there can be no recovery. (The Maria Martin, 12 Wall., 31; The Continental, 14 Wall., 345; The Sunnyside, 91 U. S., 208; The America, 92 U. S., 432.)
Although the rule of navigation for vessels passing each other on the Mississippi Hi ver, and as adjudicated, Goslee v. Shute (18 How., 463), requires the descending boat to keep near the middle of the river and the ascending vessel to keep near the right shore (and this applies to tows), Snow v. Hill (20 How., 543, 550), the plaintiff contends that, in respect of a steam vessel with barges in tow on entering the harbor of New Orleans, a different rule prevails; i. e., that in lieu of such rule a well-known custom prevails applicable to tows, and upon such custom the plaintiff grounds it right to recover in this case, though the usage or custom relied upon does not appear to have been ancient, reasonable, generally known, and certain, as required under United States v. Buchanan (8 How., 83, 103).
The special act referring the claim to this court, “with jurisdiction and authority to hear and determine the same to judgment,” contains the proviso that “ no judgment shall *291 be rendered against the Government unless it shall affirmatively appear, from the evidence adduced, that such collision was the result of negligence on the part of the officers in command of said vessels of war.”
While the language of the proviso but emphasizes the well-known rule of law, it leaves no .room to doubt the purpose of Congress in respect of the application of the rule in this case.

What are the facts?

About May 5,1888, the defendant’s vessels en fcered the harbor of New Orleans and came to anchor, their distances from the western bank varying from 650 to 350 feet, while the entire fleet extended down the river from the barge landing about 1 mile. (Findings X, xiv, and vn.)
In this position the fleet remained until the collision two days later, during which time it does not appear that the harbormaster, whose right and duty it was so to do, gave any direction or suggestion to the officers in command to change their places of anchorage. (The James Gray v. The James Frazier, 21 How., 184.)
After rounding the bend in the river at the place called the “Elevator” (not shown on the map), about 1 mile from where the Atlanta lay anchored, the towboat began to back and so continued until her tow, 607 feet in length, was brought, as finding viii shows, “ into a flanking position nearly at right angles to the current of the river,” with her stern as near the New Orleans shore as safety would permit — i. e., safety to vessels moored along the bank.
In this position she floated downstream with the current, and when about opposite Jackson street a sudden squall of high wind and rain, accompanied with thunder, developed, lasting five minutes or more (finding vii), during which time the steamboat Mabel Oameaux came upstream, hugging the New Orleans shore (finding viii), and when nearing the point opposite Celeste street she blew one blast of her steam whistle, thus indicating her intention to keep to the starboard or New Orleans shore, to which the Future City, notwithstanding her option in the premises (Blanchard v. New Jersey, etc., 59 N. Y., 292), assented by answering with one blast of her steam whistle, thereby compelling her to pass to starboard and to push her tow farther out into the stream in order to do so, and in this position she rounded the bend in the river at Celeste street, and when opposite Bichareis street, 150 yards from the Atlanta, *292 with her tow quartering out into the stream and occupying, as the collision demonstrates, nearly one-third of the river’s width, she sighted for the first time the defendant’s vessels (finding ix).
In this position and for want of time and space, after sighting the defendant’s vessels, she was unable, as finding xvi shows, to check her headway or straighten up her tow. The same .finding shows that, “the width of her tow being 175 feet, the Future City could have passed between the said United States vessels' and the New Orleans shore had there been sufficient time and space for her to check her headway and straighten up.”
Beyond question, had she kept her place in the middle of the stream, the defendant’s vessels would have been sighted much earlier than they were and the collision avoided.
When she rounded the bend in the river at the “ Elevator,” knowing that her view of the harbor would be obstructed until she passed Celeste street, even if the wind and rain did not obstruct the view, she should have gotten her tow under control, i. e., straightened it up. and so kept it until she sighted the vessels in the harbor and thereby learned the situation, instead of floating down with tbe current in a “flanking position nearly at right angles to the current;” or if she could not control her tow, as seems probable from the results, she should have broken it up at or prior to the time she reached the “Elevator;” or if, as found, the Atlanta was only 650 feet from the New Orleans shore, certainly west of the current, and a strong current sweeps from the western to the eastern shore at the bend in the river at Celeste street, then tbe tow could have been pushed with the current to the center of the stream, or if necessary to the right or Algiers shore, and the collision thereby have been avoided.
For assuming, as the plaintiff contends, that for want of time and space, the master of the vessel could not have avoided the collision at the time it occurred, still this will not excuse him, if by timely measures of precaution the collision could have been avoided. (The Syracuse v. Langley, 12 Wall., 167; The Vanderbilt v. McKibbon, 6 Wall., 225; Steward, v. Teutonia, 23 Wall., 77; The Connecticut, 303 U. S., 710.)
Certainly it would have been a timely measure of precaution for the Future City to have gotten her tow under control and straightened up after rounding the bend of the river at the “Elevator,” or to have gone to the right or Algiers shore, or to *293 have kept iu tbe middle of the stream or divided her tow. In fact, to have entered the harbor in any other way than she did.
A steamer on entering a harbor is required to exercise great care and caution and with suitable and experienced lookouts actually and vigilantly employed iu the performance of their duties, the want of which is enough to make a steamer on the Mississippi Elver liable for a collision. (Culbertson v. The Southern Bell, 18 How., 584; The New York v. Rae, 18 How., 223; The Ottawa, 3 Wall., 269; Transportation Company v. Phila., etc., 22 How., 461; Goslee v. Shute, 18 How., 463.)
And the fact that the Atlanta could not be sighted until Richard street was reached imposed upon the master of the Future City additional care and caution in the handling of her tow, especially as against vessels at anchor.
The degree of care and caution to be exercised by the master of a steamer with a tow on entering a. harbor should be measured, not only by its proximity to known danger, but by known difficulties in apprehending danger as well.
A custom which supersedes the exercise of reasonable care and caution is not reasonable, and should not be allowed to ripen into a rule of navigation.
Entering the harbor with a tow 175 feet in width and 607 feet in length, floating with the current, her tow flanking nearly at right angles to the current in a stream only 1,800 feet in width, was certainly negligence on the part of the Future City, and it was by reason of such negligence that she was unable to control and straighten up her tow so as to make her landing-in safety.
Having by her negligence, therefore, contributed to the collision, which resulted in the loss sustained, there can be no recovery, and the petition should be dismissed.