Davis, J.,
delivered tbe opinion of tbe court:
Tbe claimant was tbe owner, in December, 18G4-, of 283 bales of cotton, wbicb were captured by tbe military forces of tbe United States and sold, and whose proceeds were paid into tbe Treasury. In December, 18(38, be was a member of tbe firm of Erwin & Hardee. Said firm tben presented tbeir petition in bankruptcy to tbe proper -court in Georgia, and were in due course adjudged bankrupts. Tbe usual assignment was made to an assignee, and tlie claimant iras eventually discharged. He now asks this court to adjudge tbe restoration of tbe proceeds of tbe captured cotton in bis favor personally, claiming that be alone is entitled to it.
In support of this application be contends, in tbe first place, that tbe alleged interest in tbe Treasury fond, wbicb forms tbe subject of the present suit, did not constitute an asset at tbe time of tbe bankruptcy wbicb could pass by an assignment made under tbe provisions of tbe bankrupt law. It is said that in January, 1809, no remedy existed by wbicb tbe fund could be reached on a process begun more than two years after tbe suppression of tbe rebellion 5 and it is contended, on tbe authority of Haycraft's Case (22 Wall., 81), that cotton in tbe enemy’s country was lawful capture $ that being captured and sold, and tbe proceeds thereof passed into tbe Treasury, tbe original ■owners bad no property, estate, or interest in tbe proceeds; and that any participation in those profits subsequently permitted by Congress is grace and bounty, and not right.
We do not think that tbe opinions of tbe Supreme Court in tbe Cotton Cases are conflicting, as was intimated at tbe bar. Without citing them in detail, tbe general doctrine to be gathered from them on tbe point raised by the. claimant is this: Cotton -was tbe subject of capture because it was a leading element of tbe enemy’s strength. Tbe military was to seize it, but when taken it was to be turned over to civil officers, who were to sell it and transmit tbe proceeds to tbe Treasury, where it was to be set apart as a special fund. Tbe statute wbicb authorized tbe creation of tbe fund made provisions for proceedings against it ; and indicated who might and who might not take such proceedings, and the-time within which they must be taken. But tbe seizure and sale and transfer of tbe proceeds did not change tbe ownership of the property. As to those who *59 were loyal, it not only did not change it, but it gave them a remedy to recover it; as to those who were not so, it did not change it, because the statute made no provision for divesting them of it by confiscation or otherwise. The learned judge who dissented from the opinion of the court in the leading case describes its effect correctly in-the following words: “It maintains that the Government, in taking possession of this property and selling it, became the trustee of all the former owners, whether loyal or disloyal, and holds it for the latter until pardoned by the President or until Congress orders it to be restored.”
In this state of the law several parties (and among them the present claimant) whose disabilities were said to be removed by the President’s proclamation of December 25,1868, commenced suits in this court after the expiration of the two years named in the statute, alleging an implied contract on the part of the United States to pay them the proceeds of their cotton. It was in answer to this new position that the Supreme Court gave the decisions which the claimant relies on. Without disturbing the principles already settled, the court added that the Government has made itself an actual trustee only for such parties as it has promised to pay in case they recover judgment under the statute; that it made no promise, implied or otherwise, beyond the express promise in the act; that it authorized itself to be sued oidy within the period and hr the manner provided in the act,- and that the act is not in the nature of a statute of limitations, but is a jurisdictional statute, as are all statutes authorizing suits to be brought against a sovereign.
We see nothing in these principles inconsistent with the doctrines expounded in the cases prior to Haycraft’s Case. They do not affect the legal fact that the original owner of the captured cotton who' can trace the proceeds of his property into the Treasury has a proprietary interest in them. Is it, however, such an interest as would pass by an assignment, in bankruptcy to an assignee 9
This court has already held that it is an interest which will li ass by operation of law from an intestate to his administrator. (Tayloe's Case, 5 C, Cls. R., 701.) By parity of reasoning, should it not pass to an assignee in bankruptcy 9 However, we are not left to grope in the dark, since the court of last resort has decided that a claim against a government, although incapable of being *60 enforced in a court of law, is a right which will pass to an assignee in bankruptcy. (Comegys v. Vasse, 1 Peters, 193; Clark v. Clark, 17 Howard 315.) The granting words and the descriptive words of the bankrupt law of April 4, 1800, under which the assignment referred to in the case in Peters was made, are no more comprehensive than the language used in the bankruptcy act under which the claimant’s property was assigned to the assignee. There is, therefore, no doubt that at the time of the assignment in bankruptcy the claimant had an interest in the proceeds of his cotton in the Treasury assignable by operation of law, and that that interest, whatever it was, passed to the assignee by the assignment.
The claimant further contends that this court should treat an assignment in bankruptcy of such an interest as the present as absolutely void under the general statutes restraining the transfer of claims against the Government. Long before the passage of the present bankrupt act the Supreme Court had held that a claim against a government passes to the assignee under the general assignment in bankruptcy. If, therefore, Congress had intended to change the law in that respect, they would not have used language which had already been held to work such transfer. So far from doing tins, the statute expressly authorizes the assignee to prosecute in his own name actions for the recovery of debts or other things which might or ought to pass to the assignee.
The claimant next maintains that the facts found by the court show that the assignee in bankruptcy retransferred the claim in question to him for a valuable consideration prior to the commencement of this suit.
The claimant was adjudged a bankrupt as a member of a copartnership on the 15th of January, 1869. In March, 1872, tlxe assignee of the bankrupts’ estate represented to the court that there were a great many outstanding debts and demands belonging to said estate which could not be collected and received without inconvenient delay, and asked authority to sell the same at auction. A list of assets was attached to the petition which purported to be a complete list, and which did not contain the claim which is the subject of this action.
It is found as a fact that the assignee had no knowledge of this claim. In a copy of the bankrupts’ schedules which was prepared by the register for the use of the assignee it was set *61 fortli at length on a separate sheet. This sheet was removed from the copy of the schedules by some unknown person, and did not come to the knovdedge of the assignee; and when he sold the assets, he had no personal knowledge of the existence of the claim which is the subject of this suit.
The petition for authority to sell at auction was granted, but the plan proved to be impracticable. In November and December, 1872, the claimant negotiated with the assignee for the purchase of the assets of the copartnership. The negotiation resulted in his purchasing, for an agreed consideration, “allthe remaining assets of the late firm.” ” The money was paid, and the asssignee returned to the claimant all the copartnership assets remaining uncollected, andas a part of tiie transaction delivered to him what purported to be “all of the books and papers representing theremaining assets of the firm of Erwin & Hardee and of the individual assets.” This vras done with the knowledge and assent of all the creditors, to whom a final dividend was made out of the sum so paid by the claimant.
In our opinion no interest in the subject of this suit passed by that transaction. On its face, the complainant bargained and paid only for the uncollected partnership assets. It did not warrant the assignee in attempting to transfer, and the claimant in attempting to receive, an individual asset not included in the bargain and purchase. Moreover, it is of the essence of a contract that the minds of the two contractors should come together. Theclaimantprobablyintendedtobuytheclaim, butthe assignee did not know of its existence, and therefore could not have intended to sell it. The minds of the two parties, therefore, never came together on. the subject of the alleged sale, and no sale took place.
The claimant further maintains that whatever Mow the court may take of the effect of the assignment in bankruptcy and of the transfer to him from the official assignee, the act of February 5, 1877, confers upon him,, and upon him alone, the power to to maintain this action.
That act recites in effect, though not in this exact language, that it is represented to Congress that the claimant’s property was taken from him in a manner which would have entitled him to recover the proceeds of the.same in the Treasury under the provisions of the Abandoned and Captured property Act had proceedings therefor been instituted within the time named in the *62 act, and. that without the fault or neglect of the claimant, but entirely through the accident or mistake of his agent or attorney, such proceedings were not instituted within such time. In evident consideration of such representation, the act enacts that this court may take jurisdiction of the claimant’s claims under the provisions of the said Abandoned and Captured property Act of March 12,1863.
Some of the averments in the claimant’s pleadings in this suit are not quite consistent with the recitals in the act of February 5, 1877. We assume that the recitals in the act will be regarded as conclusive; but it is also to be assumed that other material facts known to this court were not known to Congress, .since they are not recited in the act. Congress, therefore, neither intended to legislate upon conflicting claims to the property nor to decide who should be entitled to the fund in the Treasury in the event of one being found there. Such would be the natural construction of the words of grant in the act, taken by themselves. Taken in connection with the recital, the conclusion is irresistible.
Hence it is to be assumed that the claimant is not entitled to recover the proceed of the cotton in the Treasury on either of the grounds contended for by him.
The claimant’s petition must be dismissed.